**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Dakota Oil Processing, LLC** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.: _____** |
| **v.** | : | |
| **Christopher G. Hayes, Esquire, Individually** | : | **JURY TRIAL DEMANDED** |
| **And** | : | |
| **The Law Office of Christopher G. Hayes** | : | |
| **And** | : | |
| **Jeffry L. Hardin, Esquire, Individually** | : | |
| **And** | : | |
| **Locke Lord LLP,** | : | |
| **Defendants.** | : | |

## <u>COMPLAINT</u>

Plaintiff, Dakota Oil Processing, LLC, by and through its undersigned counsel, files this Complaint against Defendants Christopher G. Hayes, Esquire, Law Office of Christopher G. Hayes, Jeffry L. Hardin, Esquire, and Locke Lord LLP (collectively, "Defendants"), and states as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is a legal malpractice action arising out of Defendants' failures to protect Plaintiff's rights and interests in connection with a business transaction.   While the underlying transaction was complex, Defendants' negligence is simple and straightforward.   Plaintiff retained the Law Office of Christopher G. Hayes to hold money in escrow until it received funding to begin a construction project, and retained Locke Lord LLP to ensure that its escrow

deposit was not released prematurely. Neither firm did their job. Specifically, Locke Lord failed to enact sufficient safeguards to prevent the premature disbursement of Plaintiff's escrow deposit, and Attorney Hayes failed to confirm that Plaintiff had actually received any funds before releasing Plaintiff's money. Due to Defendants' combined failures, Plaintiff lost its entire escrow payment along with the funding it should have received in the underlying transaction, resulting in cumulative damages in excess of $3 million.

## PARTIES

2.  Plaintiff Dakota Oil Processing, LLC ("Dakota"), is a limited liability company incorporated in the State of North Dakota with its principal place of business located at 2520 Highway 35, Suite 102, Manasquan, New Jersey.

3.  Defendant Christopher G. Hayes, Esquire ("Attorney Hayes"), is an attorney licensed to practice law in Pennsylvania with offices at 225 South Church Street, West Chester, Pennsylvania.

4.  Defendant Law Office of Christopher G. Hayes ("Hayes Law") is a professional corporation engaged in the practice of law, with offices located at 225 South Church Street, West Chester, Pennsylvania.

5.  Defendant Jeffry L. Hardin, Esquire ("Attorney Hardin"), was an attorney licensed to practice law in the District of Columbia with offices located at 701 8th St NW, Suite 700, Washington, D.C.

6.  Defendant Locke Lord LLP ("Locke Lord") is a professional corporation engaged in the practice of law, with offices located at 701 8th St NW, Suite 700, Washington, D.C.

7.      Upon information and belief, at all times relevant Defendant Hayes was a partner, owner, shareholder and/or employee of Defendant Hayes Law who acted within the scope of his employment.

8.      Upon information and belief, at all times relevant Defendant Hardin was a partner, owner, shareholder and/or employee of Defendant Locke Lord who acted within the scope of his employment.

9.      At all times relevant, Hayes Law acted through its partners, owners, shareholders employees, agents, servants or other authorized representatives of Hayes Law.

10.     At all times relevant, Locke Lord acted through its partners, owners, shareholders employees, agents, servants or other authorized representatives of Locke Lord.

## JURISDICTION AND VENUE

11.     Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendants and venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial portion of the events or omissions giving rise to this action occurred in the Commonwealth of Pennsylvania and this district.

## FACTUAL ALLEGATIONS

13.     Dakota is an oil development company formed for the purpose of developing, constructing, owning and operating a crude oil topping refinery near Trenton, North Dakota (the "Project").

14.     In or around early 2016, Dakota engaged SRW Ventures, LLC ("SRW"), a financial advisory firm, to obtain financing for the Project through Cal & Schwartz ("C&S"), a venture financing firm, in the form of a Collateral Transaction Loan (the "Loan").

15.     Pursuant to the Loan, Dakota agreed to pay C&S $2.5 million ($2,500,000.00) (the "Escrow Payment") once C&S secured a Standby Letter of Credit ("Letter of Credit") in the amount of $500 million ($500,000,000.00) through HSBC, PLC ("HSBC"), after which a third-party lender would utilize the Letter of Credit as collateral to lend funds to develop the Project.

16.     On or around August 10, 2016, Dakota and C&S executed a transaction agreement (the "Transaction Agreement") in connection with the Loan.  A true and correct copy of the Transaction Agreement is attached hereto as Exhibit ("Ex.") "A."

17.     The Transaction Agreement named Emile Barton, Esquire ("Attorney Barton"), an attorney based in New York, as the escrow agent for the Loan.  *See* Ex. A.

18.     On or around August 15, 2016, to facilitate the deposit of the Escrow Payment, Dakota and Attorney Barton entered into an Escrow Agreement (the "First Escrow Agreement"). A true and correct copy of the First Escrow Agreement is attached hereto as Exhibit "B."

19.     The First Escrow Agreement provided that Attorney Barton "shall only release the [Escrow Payment] upon receipt of written instructions executed by Mark Gulis on behalf of [Dakota]," and further provided that, "[u]pon receipt of such instructions to release the [Escrow Payment], [Attorney Barton] shall immediately release the [Escrow Payment] strictly in the form of a wire transfer" to an account specifically designated by Dakota.  *See* Ex. B at ¶ 4.

20.     On or about August 8, 2016, Dakota, Attorney Barton, and Capital One, Dakota's Bank, entered into a Joint Escrow Instructions Agreement (the "Escrow Instructions Agreement") and an Escrow Deposit Agreement (the "Escrow Deposit Agreement").  True and

correct copies of the Escrow Instructions Agreement and the Escrow Deposit Agreement are attached hereto as Exhibits "C" and "D", respectively.

21.     The Escrow Instructions Agreement provided that, once C&S delivered the initial funding due under the Loan, Dakota and Attorney Barton would pay C&S the Escrow Payment "by jointly authorizing [Capital One] to release such amount, pursuant to the terms and instructions set forth in the Escrow Deposit Agreement, from [Dakota's Escrow Account]." *See* Ex. C at ¶ 4.

22.     The Escrow Instructions Agreement further provided that Dakota "shall provide such authorization if [Dakota] has given prior written notice to [Attorney Barton] that [the initial funding due under the Loan was received]; and in the absence of such notice from [Dakota], [Attorney Barton] shall not be authorized to issue any notice to [Capital One] or release any funds from [Dakota's Escrow Account]." *See* Id.

23.     The Escrow Deposit Agreement provided that Capital One would release the Escrow Payment to C&S upon written instructions from Dakota and Attorney Barton, and further provided that:

> Joint instructions to [Capital One] shall be signed by Mark Gulis on behalf of [Dakota] and Emile J. Barton on behalf of Barton and delivered to [Capital One] in counterparts, which together shall constitute one document, in the form of Capital One's wire transfer instructions….

> *See* Ex. D at ¶ 4.

24.     From August 11, 2016 until August 18, 2016, Dakota arranged with Attorney Barton to fund the Escrow Payment.

25.     On or around August 18, 2016, C&S informed Dakota that it required Attorney Hayes to replace Attorney Barton as escrow agent in order to proceed with the Loan.

26.     Shortly thereafter, on or around August 25, 2016, Dakota retained Locke Lord to negotiate the terms of the escrow arrangement with Attorney Hayes, among other things.  A true and correct copy of the engagement agreement dated August 25, 2016 between Locke Lord and Dakota is attached hereto as Exhibit "E."

27.     On or about September 13, 2016, Dakota executed a revised Transaction Agreement (the "Second Escrow Agreement") in connection with the Loan.   A true and correct copy of the Second Escrow Agreement is attached hereto as Exhibit "F."

28.     The Second Escrow Agreement provided that, "upon the issuance of a confirmation of receipt by [Dakota's] Bank of [$5 million in initial funding under the Loan] and receipt by [Attorney Hayes] of such confirmation (such confirmation shall be sent by [Dakota's] Bank to [Attorney Hayes] and copied to [Dakota] and [C&S]), [Attorney Hayes] shall immediately issue disbursement instructions to [his bank] to pay [C&S] on behalf of [Dakota] the sum of [$2.5 million] from [Attorney Hayes'] escrow account."  *See* Ex. F at ¶ 5.

29.     By email to Dakota dated September 14, 2016 (the "September 14 Email"), Attorney Hardin stated that the "key with using [Attorney] Hayes is to be certain that he cannot be duped into prematur[e]ly releasing your money.  You need to be certain that only a legitimate email (or maybe an old school fax?), and maybe followed by a confirmatory call with you banker, will result in the release."  A true and correct copy of the September 14 Email is attached hereto as Exhibit "G."

30.     Between September 14, 2016 and September 29, 2016, Attorney Hardin and Attorney Hayes discussed the Escrow Agreement and the authentication process required to ensure that Dakota received the funding under the Loan prior to the release of the Escrow Payment to C&S.

31.     For example, by email dated September 28, 2016 (the "September 28 Email"), Attorney Hardin wrote to inform Attorney Hayes that Dakota's bank would send an email to Attorney Hayes "indicating that the funds have been received by Dakota Oil (with the incoming wire information), and there will be a phone number and person at [Dakota's bank] that you will need to call to authenticate the email and make the confirmation valid."  A true and correct copy of the September 28 Email is attached hereto as Exhibit "H."

32.     On or about September 28, 2016, Attorney Hayes executed the Second Escrow Agreement.  While the Second Escrow Agreement identified Attorney Hayes as the "escrow manager" for the Loan, Attorney Hayes executed the Second Escrow Agreement as the "escrow attorney" for Dakota and C&S.

33.     Notwithstanding the warnings and instructions contained in Attorney Hardin's correspondence, the Second Escrow Agreement was never revised to require telephonic or facsimile confirmation of funding from Dakota or its bank prior to the disbursement of the Escrow Payment.

34.     On or about September 30, 2016, Dakota funded the Escrow Payment pursuant to the terms of the Second Escrow Agreement.

35.     To fund the Escrow Payment, Dakota executed a senior secured note (the "Note") in the amount of $2.5 million plus annual interest of five percent.  A true and correct copy of the Note is attached hereto as Exhibit "I."

36.     On or about November 3, 2016, Dakota discovered that Attorney Hayes had released the Escrow Payment without authorization, and without confirmation that Dakota had received any funding under the Loan.

37.     Despite the disbursement of the Escrow Payment, Dakota never received any funding under the Loan.

38.     As a result of Defendants' negligence and/or recklessness, Dakota has incurred substantial damages, losses and harms.

## COUNT I – PROFESSIONAL NEGLIGENCE

39.     Dakota incorporates by reference Paragraphs 1 through 36.

40.     Defendants, acting by herself/himself/themselves or through her/his/their agents and employees, acted recklessly and/or negligently and/or with reckless indifference in a variety of ways, including but not limited to the following:

    a.   Failing to properly advise Dakota;

    b.   Failing to utilize reasonable and proper authentication methods and procedures;

    c.   Failing to prevent the misappropriation of the Escrow Payment;

    d.   Failing to implement systems to prevent or detect misappropriation;

    e.   Failing to advise Dakota of the deficiencies in the authentication procedures under the Second Escrow Agreement which enhanced the opportunity for misappropriation;

    f.   Failing to timely communicate with Dakota;

    g.   Breaching the duty of loyalty to Dakota;

    h.   Breaching their fiduciary duties to Dakota;

    i.   Failing to properly represent Dakota;

j.  Failing to make necessary inquiries in accordance with reasonable professional standards so as to discover what was readily discoverable in order to protect Plaintiffs;

k.  Ignoring suspicious circumstances which should have raised a "red flag" for a reasonably skilled and knowledgeable attorney;

l.  Failing to properly advise Plaintiffs of the misappropriation; and

m.  Failing to exercise the degree of skill and professional care in performance of their services as reasonably prudent, skillful attorneys would under the circumstances.

41.     In connection with the above-referenced misappropriation, Defendants provided Dakota with advice, opinions, recommendations and representations that they knew or should have known to be wrong.

42.     As a direct and proximate result of Defendants' conduct, Dakota suffered significant monetary damages, including but not limited to:

a.  The loss of the Escrow Payment;

b.  The loss of the interest due under the Note;

c.  The loss of the funding due under the Loan;

d.  The cost of the services provided by Defendants.

43.     Defendants' conduct as detailed above is outrageous and demonstrates a reckless indifference and total lack of regard as to Dakota's rights.  Defendants' aforesaid outrageous conduct and reckless indifference to Dakota's rights warrants an award of punitive damages.

## Count II – Breach of Contract

44.     Dakota incorporates by reference Paragraphs 1 through 41.

45.     Defendants entered into valid binding contracts with Dakota to provide legal services.

46.     Dakota performed all the conditions required in the aforementioned contracts.

47.     Defendants breached and otherwise failed to perform their duties and obligations under the contracts in a multitude of ways including but not limited to:

   a.   Failing to properly advise Dakota;

   b.   Failing to utilize reasonable and proper authentication methods and procedures;

   c.   Failing to prevent the misappropriation of the Escrow Payment;

   d.   Failing to implement systems to prevent or detect misappropriation;

   e.   Failing to advise Dakota of the deficiencies in the authentication procedures under the Second Escrow Agreement which enhanced the opportunity for misappropriation;

   f.   Failing to timely communicate with Dakota;

   g.   Breaching the duty of loyalty to Dakota;

   h.   Breaching their fiduciary duties to Dakota;

   i.   Failing to properly represent Dakota;

   j.   Failing to make necessary inquiries in accordance with reasonable professional standards so as to discover what was readily discoverable in order to protect Plaintiffs;

   k.   Ignoring suspicious circumstances which should have raised a "red flag" for a reasonably skilled and knowledgeable attorney;

   l.   Failing to properly advise Plaintiffs of the misappropriation; and

m. Failing to exercise the degree of skill and professional care in performance of their services as reasonably prudent, skillful attorneys would under the circumstances.

48.     As a result of Defendants' breach of contract, Dakota has suffered incidental, consequential and other damages, including lost or stolen monies, lost business opportunities, interest, time and profits and additional remedial professional services fees and costs.   In addition, Dakota paid for deficient services that failed to be in accordance with the profession at large.

## Count III – Breach of Fiduciary Duty

49.     Dakota incorporate by reference Paragraphs 1 through 46.

50.     Defendants owed fiduciary responsibilities to Dakota.

51.     These fiduciary responsibilities and duties form the foundation of the attorney-client relationship.

52.     Dakota relied upon Defendants to vigilantly discharge these fiduciary duties and relied upon Defendants' representations about actions intended to be taken, or actually taken on Dakota's behalf in connection with above-referenced transactions.

53.     Defendants breached these fiduciary responsibilities.

54.     As a result of the breach of fiduciary relationship, Dakota suffered damages as set forth previously.

## PRAYER FOR RELIEF

WHEREFORE, Dakota respectfully prays that the Court enter judgment against Defendants and in favor of Dakota, as follows:

A.      On Count I, compensatory and punitive damages in an amount to be determined at trial, but not less than $75,000.00;

B.      On Count II, compensatory damages in an amount to be determined at trial, but not less than $75,000.00;

C.      On Count III, compensatory damages in an amount to be determined at trial, but not less than $75,000.00; and

D.      Such other relief as the Court deems just, proper and equitable.

## JURY DEMANDED

Dakota hereby demands a trial by jury on all matters so triable.

Respectfully submitted,

**COHN & ASSOCIATES**

By: _____
Clifford B. Cohn, Esquire
Jonathan A. Zakheim, Esquire
926 Public Ledger Building
620 Chestnut Street
Philadelphia, PA 19106

*Attorneys for Plaintiff Dakota Oil Processing, LLC*

Date:    October 5, 2018